**Affirmed and Memorandum Opinion filed April 5, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-10-00569-CR

---

**MICHAEL A. ROCHA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 182nd District Court
Harris County, Texas
Trial Court Cause No. 1176904**

---

## M E M O R A N D U M   O P I N I O N

Appellant, Michael A. Rocha, appeals his conviction for aggravated assault with a deadly weapon. In four issues, appellant contends (1) the evidence is legally insufficient to support his conviction, (2) the trial court erred by refusing to include a mistake-of-fact instruction in the jury charge, (3) the trial court erred by permitting the State to comment on appellant's post-arrest silence, and (4) appellant was denied a fair trial because the State referred to him by several derogatory terms during closing argument. We affirm.

# I. Background

At the time of the charged offense, appellant was a Houston Metropolitan Police officer, although his employment was subsequently terminated. Appellant, his wife, and their two young children lived in the upstairs unit of a duplex. The girlfriend of appellant's brother-in-law lived in the downstairs unit.

On the night of April 12, 2008, and into the early morning of April 13, appellant, who was off-duty, his wife, and several friends socialized at appellant's home. Their gathering was "low-key," with the participants playing games and drinking beer. A larger, raucous party was in progress at the downstairs unit, and many attendees became intoxicated. Pertinent to the present case, attendees at the downstairs party included: Aladdin Hatamleh, a deputy Harris County constable and appellant's friend, who ultimately joined the gathering at appellant's home; Enrique Torres, a then-police officer and appellant's friend, who joined the downstairs party after visiting appellant; David Hernandez; the Gutierrez brothers—Michael, Anthony, and Andrew; and complainant Anthony Dunham. The downstairs party was convivial until a brawl occurred at some point after midnight. The brawl resulted in an encounter between appellant and Dunham, which formed the basis for the aggravated-assault charge at issue.

## A. The Brawl

Although testimony differed regarding which party instigated the confrontation, the brawl initially involved physical fighting between at least Torres and the Gutierrez brothers, which escalated as others joined the melee. Torres successfully defended himself and was observed at one point "severely" beating the legally-blind Anthony Gutierrez. Appellant and Hatamleh intervened after they noticed the event from appellant's balcony and appellant's brother-in-law motioned for appellant to retrieve Torres. According to Torres, appellant ran toward one of Torres's assailants and "tackled" him, resulting in a struggle involving various persons. In contrast, appellant testified he was attacked while attempting to stop the fight and retrieve Torres; appellant was "punched" in the mouth, pushed to the ground, and thrown in some bushes, and he

2

kept yelling, "Stop. Get off me. I'm a police officer." Hatamleh testified he was attacked by Michael Gutierrez while attempting to assist appellant, but Hatamleh easily restrained Michael, who is also legally blind, and ordered Michael's companions to remove Michael from the scene.

Appellant and Hatamleh testified that Michael then made a threat which they described at trial using similar language: appellant heard, "All you motherf****s are dead. I'm going to the car to get a gun. Everybody in the house is dead"; Hatamleh heard, "I got a gun in my car. I'm going to do a drive-by. All you motherf****s are dead." Hatamleh testified that, during this time, Michael's companions were trying to drag him to a car, but they experienced difficulty restraining him, and Michael still attempted to approach Hatamleh. However, appellant testified that, as soon as Michael made the threat, he began walking toward the parking area without his companions trying to restrain him.

Hatamleh and appellant then went upstairs to appellant's home where Hatamleh retrieved appellant's Glock pistol and appellant retrieved his AR-15 (assault rifle), which he was certified to carry as a police officer; appellant testified he intended to protect everyone on the premises, including his family. Neither called 9-1-1 at any time: Hatamleh testified he was afraid of an ambush while using his cell phone but ordered others to call 9-1-1; appellant claimed he had no home phone and lacked access to his cell phone but, while retrieving the rifle, yelled for someone in his home to call 9-1-1.

Torres testified that, in the meantime, he went upstairs and retrieved his gun and keys in order to leave, he heard Michael Gutierrez's threat after returning downstairs, and Torres fired three shots toward the ground; at one point, Torres indicated the shots were fired in anger that he was involved in the brawl, but at another point, he testified the shots were intended to disperse the crowd. Appellant also testified that he heard gunshots while upstairs retrieving his rifle. However, as we will further mention, several other witnesses testified the gunshots were fired later in the incident. In any event, as

Hatamleh and appellant returned downstairs, Hatamleh carried the pistol in his waistband, but appellant openly carried the rifle.

Meanwhile, Dunham was involved in the brawl at some point. Dunham testified that he merely intervened to diffuse a confrontation between Anthony Gutierrez and some "shadier-looking characters." This group turned their focus to Dunham, calling him derogatory names and striking his head. Dunham began "swinging" until his assailants "backed off." Dunham went inside where he cleaned blood from his face and shirt and then tried to leave the party. After exiting the downstairs unit to walk toward his car, Dunham immediately encountered appellant.

## B.    The Encounter

At trial, the following witnesses provided accounts regarding this encounter:

### Anthony Dunham

According to Dunham, appellant grabbed Dunham's shoulder from behind. Dunham turned and saw appellant pointing an AR-15 at Dunham's face. As Dunham turned, his fist was "balled up" to "throw a punch" because he feared another attack, but he placed his hands up when he saw the rifle. Appellant ordered Dunham to get behind a car where appellant, with "an angry look on his face," screamed at Dunham to get on his knees, and Dunham complied. Dunham then heard unknown voices say, "No" and "Stop" and "get up and run." Dunham ran to his own car, but it would not start, so he hid in the backseat. Police officers subsequently removed Dunham from his car, temporarily detained him, and eventually released him.

### David Hernandez

Hernandez generally confirmed Dunham's account but added details. Hernandez observed appellant after he descended the stairs; appellant appeared furious and was holding a rifle "in a position of like he was going to use it." Appellant "aggressively" grabbed Dunham as he walked by. "With the gun facing" Dunham, appellant ordered him behind a car. Dunham did not resist and placed his hands up. Behind the car,

4

appellant pointed the rifle at Dunham's head and ordered, "get on your f****** knees," and Dunham complied. Hernandez tried to intervene by tapping appellant and asking "what are you doing?" Appellant shouted, "get the f*** away." Hatamleh and Torres both approached appellant. Hatamleh spoke to appellant and then told Dunham to run.

**Enrique Torres**

Torres saw appellant descend the stairs, carrying his AR-15; appellant appeared angry and "ready for war." Torres tried to push the crowd away as a precaution although he did not believe appellant would fire the rifle. Torres then noticed Dunham was "kind of kneeled" and "stumbling" while appellant yelled, "You need to get the f*** out of my house. Get the f*** out of here" and berated Dunham with other obscenities. Dunham did not resist and appeared, "dazed," "drunk" and "out of it." At one point, Torres testified appellant did not "malicious[ly]" point the rifle at Dunham but the rifle was "in the vicinity." However, at another point, Torres indicated that appellant pointed the rifle at Dunham. Torres approached, told appellant to put the rifle away, instructed Dunham to leave, and pushed Dunham toward the front of the house.

**Aladdin Hatamleh**

Although the State presented Hatamleh as a witness, he essentially testified appellant did not behave improperly during the encounter. According to Hatamleh, while appellant held the rifle "out to his side," he grabbed Dunham by the collar and pulled him down, but Dunham resisted. Appellant physically forced Dunham to his knees. Appellant was angry and cursing but never pointed the gun at Dunham. Hatamleh approached appellant, said, "let's just end it. Let him go," and ordered Dunham to run.

**Appellant**

According to appellant, after he returned downstairs, he saw Dunham running out the back door. Appellant yelled for Dunham to stop, but Dunham raised a clinched fist as though he intended to strike appellant. Appellant "picked . . . up" his rifle, pointed it at Dunham's torso—not his head, and told Dunham to stop. When Dunham did not

5

respond, appellant dropped the rifle to his side, grabbed the back of Dunham's shirt, and walked him behind a car for the safety of both Dunham and appellant. With the rifle pointing down, appellant ordered Dunham to "get down," and Dunham resisted. Appellant pushed Dunham down and frisked him for weapons. Appellant was "cool, calm, and collected" during this time. David Hernandez grabbed appellant's arm, and appellant said, "get the f*** away from me." When Hatamleh approached, they determined Dunham was not a threat and ordered him to run.

## C.     Events after the Encounter

All testimony seems generally consistent relative to the fact that, after Dunham was released, appellant, Hatamleh, and Torres walked toward the area where vehicles were parked and a crowd was still gathered. Dunham, Hernandez, and Hatamleh all testified that the gunshots were fired during this time.[1] Appellant and Hatamleh seemed to characterize their continued involvement as intended to determine if anyone was hurt and assist in placing Michael Gutierrez in a car. However, Hernandez and Torres claimed that more brawling occurred: appellant raised his rifle again and Torres "punched" Anthony Gutierrez because Anthony cursed at appellant's wife, who had become involved and was earlier observed "stomping" Anthony's head. Appellant returned to his home and Torres left the scene when they heard sirens.

Among other officers, Houston Police Officer Ezekial Gutierrez and Sergeant Ed Payne arrived at the scene. According to their testimony, after police diffused the remaining brawl, Officer Gutierrez and Sergeant Payne went to appellant's home because they determined he was involved in the incident. When appellant answered the door, he acted "nonchalant[ly]" by asking, "What's Up Bro?" The officers interviewed appellant after he voluntarily accompanied them downstairs. Appellant told them that he went downstairs to break up a fight, then returned home to wash blood from his hands, did not display or discharge a weapon during the incident, and did not hear any gunshots.

---

[1] Torres undisputedly fired the shots heard that night. The State stipulated appellant did not discharge his rifle.

6

These officers called Sergeant Kevin Williams of the Metropolitan Police Department (appellant's then-employer). At the scene, when Sergeant Williams inquired about the incident, appellant described the extent of his involvement as he went downstairs to break up a fight, was struck and thrown in some bushes, and then returned to his home; appellant did not mention having been threatened or having displayed a weapon although appellant did state he heard gunshots while he was upstairs. Sergeant Williams referred the matter to the department's Internal Affairs Division for investigation but suspended appellant and confiscated his weapons.

At trial, appellant explained that he returned home after hearing sirens based on concern that he was holding a rifle and might be immediately viewed by the police as an assailant and possibly shot; he then remained home to comfort his children who heard the commotion. Appellant further claimed that, during the interviews at the scene, he was not given the opportunity to provide his version of the incident because officers focused solely on determining whether he had discharged a weapon. However, appellant also admitted he declined the Metropolitan Police Department's subsequent request that he make a statement. Torres testified that he spoke with appellant by telephone shortly after the incident; they discussed that Torres discharged his weapon, appellant displayed his rifle, how "things went wrong," "we screwed up," and "we made the wrong decision."

A jury convicted appellant of aggravated assault with a deadly weapon and assessed punishment at three years' confinement and a fine, both probated. The trial court rendered judgment accordingly, placing appellant on community supervision.

## II. SUFFICIENCY OF THE EVIDENCE

In his first issue, appellant contends the evidence is legally insufficient to support his conviction.

## A.     Applicable Law and Standard of Review

A person commits aggravated assault if he "intentionally or knowingly threatens another with imminent bodily injury" and "uses or exhibits a deadly weapon during the

7

commission of the assault." Tex. Penal Code Ann. §§ 22.01(a)(2); 22.02(a)(2) (West 2011).

When reviewing sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). We do not sit as thirteenth juror and may not substitute our judgment for that of the fact finder by re-evaluating weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* This standard applies equally to both circumstantial and direct evidence. *Id.* Our duty as reviewing court is to ensure the evidence presented actually supports a conclusion that the defendant committed the crime. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The trial court instructed the jury on the law of self-defense under the following provisions pertinent to appellant's contentions on appeal. Subject to certain exceptions inapplicable in the present case, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31(a) (West 2011). The use of deadly force in self-defense is not justified except as authorized under section 9.32. *Id.* § 9.31(d). Section 9.32 provides that a person is justified in using deadly force against another:

(1) if the actor would be justified in using force against the other under Section 9.31; and

(2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:

(A)  to protect the actor against the other's use or attempted use of unlawful deadly force; or

(B)  to prevent the other's imminent commission of . . .  murder . . . .

*Id.* § 9.32(a) (West 2011).

Additionally, section 9.04 addresses "Threats as Justifiable Force":

The threat of force is justified when the use of force is justified by this chapter. For purposes of this section, a threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force.

*Id.* § 9.04 (West 2011).

Relative to the law on both justification in using force and justification in using deadly force, the trial court instructed the jury, "[i]t is not necessary that there be an actual attack or attempted attack, as a person has a right to defend his person from apparent danger as fully and to the same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time . . . ."  The court also defined "reasonable belief" as "a belief that would be held by an ordinary and prudent person in the same circumstances as the defendant." *See id.* § 1.07(a)(42) (West Supp. 2011).

The defendant bears the initial burden to produce evidence supporting self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003).  Once evidence is produced, the burden shifts to the State to disprove the defense beyond a reasonable doubt.  *Id.*  This burden of persuasion does not require production of evidence but requires only that the State prove guilt beyond a reasonable doubt.  *Id.*  When a jury finds the defendant guilty, there is an implicit finding against self-defense.  *Id.*  When reviewing legal sufficiency of the evidence supporting a finding against self-defense, we view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found (1) the essential elements of the charged offense beyond a reasonable doubt, and (2) against the defendant on the self-defense issue

beyond a reasonable doubt.  *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *Hernandez v. State*, 309 S.W.3d 661, 665 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd).

## B.    Analysis

Initially, we acknowledge that the jury heard some conflicting testimony—either among witnesses or internally in a particular witness's testimony.  Additionally, appellant emphasizes (1) some State's witnesses provided reports to the police that conflicted with their trial testimony, and (2) some evidence indicated Dunham consumed an excessive amount of alcohol and appellant was not intoxicated that night, although one State witness recalled appellant was intoxicated.  However, the jury was free to resolve all these inconsistencies, believe part or all of any witness's testimony, and consider the amount of alcohol consumed by each witness when evaluating credibility.  *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).

A rational jury could have found the elements of aggravated assault beyond a reasonable doubt based on the State's evidence that appellant pointed his rifle at Dunham's face and then forcefully escorted him behind a car where appellant ordered Dunham to his knees, pointed the rifle at his head, and berated him with obscenities.  In fact, appellant admitted that he pointed the rifle at Dunham during the first part of their encounter although appellant claims the gun was pointed at Dunham's torso.  *See Dickerson v. State*, 745 S.W.2d 401, 403 (Tex. App.—Houston [14th Dist.] 1987, pet. ref'd) (holding that defendant's pointing gun at complainant is alone sufficient to establish threat required for aggravated-assault conviction).

Rather, the gist of appellant's complaint is that he acted in self-defense.  Citing Texas Penal Code section 9.04, appellant suggests that his threat via display of the rifle did not constitute use of deadly force because his "purpose [was] limited to creating an apprehension that he [would] use deadly force if necessary."  *See* Tex. Penal Code Ann. § 9.04.  Thus, appellant apparently argues he was not required to satisfy section 9.32 relative to the circumstances under which use of *deadly* force is justified and was merely

10

required to satisfy section 9.31; i.e., he was authorized to display the rifle as long as he "reasonably believe[d] [this action was] immediately necessary to protect [himself] against [Dunham's] use or attempted use of" *any* unlawful force—not just Dunham's use or attempted use of *deadly* force. *Compare id.* § 9.31(a), *with* § 9.32(a). We acknowledge there is no direct evidence appellant actually intended to shoot Dunham. Nonetheless, we need not decide whether appellant was required to satisfy the more stringent standard of section 9.32 because the evidence is sufficient to support the jury's implicit rejection of appellant's self-defense claim even under section 9.31; i.e., the jury could have found beyond a reasonable doubt that appellant did not reasonably believe his pointing the rifle at Dunham was immediately necessary to protect himself against Dunham's use or attempted use of *any* unlawful force. *See id.* § 9.31.[2]

In this regard, appellant's self-defense contention has two aspects. First, appellant suggests he was justified in initially pointing the rifle at Dunham because appellant reasonably believed that Dunham intended to strike appellant. However, as Dunham's testimony indicated, appellant grabbed Dunham and was already pointing the rifle at his face before Dunham turned toward appellant with a clinched fist. Therefore, the jury could have concluded appellant did not point the rifle at Dunham *in response* to a perceived threat that Dunham intended to strike appellant. Nonetheless, even if the jury found that appellant was justified in initially pointing the rifle at Dunham, the jury could have concluded appellant lacked justification to continue detaining Dunham at gunpoint once Dunham unclenched his fist, placed his hands up, and presented no further threat.

With respect to the second aspect of appellant's self-defense contention, he apparently contends that, based on the melee in progress, he reasonably believed Dunham was the assailant who fired gunshots and/or threatened to commit a drive-by shooting and

---

[2] Despite appellant's argument that he was not required to satisfy section 9.32, appellant does suggest relative to one aspect of his self-defense claim, as discussed below, section 9.32 was satisfied because he reasonably believed Dunham was the assailant who threatened to kill everyone on the premises. Nonetheless, the evidence is sufficient to support the jury's finding that appellant did not reasonably believe his display of the rifle was immediately necessary to protect himself against Dunham's use or attempted use of *any* unlawful force.

11

kill everyone on the premises; thus, appellant was justified in initially stopping and pointing the rifle at Dunham, even under the State's version of the incident, and continuing to detain Dunham while either displaying or pointing the rifle.[3]

However, the following evidence or rational inferences supported a finding that appellant did not reasonably believe any assailant posed a threat to kill occupants of the premises, or alternatively, appellant did not reasonably believe Dunham posed such a threat; rather, appellant was angry that he and his friends were attacked in the brawl on appellant's premises by participants who failed to respect appellant and his friends were police officers, and appellant reacted by accosting the first person he randomly encountered after retrieving the rifle:

- Ample evidence demonstrated appellant's angry demeanor, use of expletives, and aggressive behavior during his initial involvement in the brawl, the encounter with Dunham, and appellant's subsequent further confrontation with brawl participants.

- Even appellant's fellow officers, Torres and Hatamleh, felt compelled to intervene and persuade appellant to release Dunham, despite Hatamleh's characterization of appellant's actions as proper. In fact, Torres described appellant's actions as "overboard" and inconsistent with "controlled, calm, police action."

- Some testimony indicated gunshots were fired *after* appellant's encounter with Dunham, and in one of appellant's accounts to investigating officers, he denied having heard *any* gunshots.

- No person, other than appellant and his fellow officers, used or exhibited a weapon during the incident.

- No witnesses other than appellant and his fellow officers claimed to have heard the alleged oral threat, and appellant did not mention the threat to Sergeant Williams when summarizing the incident.

---

[3] The trial court did not instruct the jury on "Defense of Third Person," *see* Tex. Penal Code Ann. §9.33, and submitted only a self-defense instruction. Nonetheless, appellant's professed desire to protect everyone on the premises would necessarily include protecting himself; thus, we will consider his professed desire to protect everyone as relevant to his self-defense claim.

12

- Although appellant testified that the assailant who made the alleged threat then walked toward the parking area, Hatamleh indicated the assailant was still attempting to approach Hatamleh and thus not acting on his threat.

- If appellant, as well as Hatamleh, believed the assailant might act on the alleged threat, they would have called 9-1-1, remained downstairs to ensure the assailant posed no further danger instead of leaving other occupants unprotected while they retrieved weapons upstairs, and/or escorted the assailant to a vehicle, considering he had already been easily restrained once by Hatamleh.

- Appellant knew Michael Gutierrez made the alleged threat, although appellant did not know Michael's name at the time; Dunham testified he was "quite a bit different" in appearance from Michael, Dunham was the only non-Hispanic person present that night, and Dunham could not have been mistaken for any Gutierrez brother.

- Even under appellant's version, the assailant who made the threat was outside and then walked toward the vehicles whereas appellant stopped Dunham after he ran out a back door.

- Uncontroverted testimony demonstrated Dunham did not threaten anyone or have any more involvement in the brawl after his initial attempt to defend himself.

- Testimony indicated that Dunham did not act aggressively or resist when appellant ordered him to his knees and instead appeared dazed and/or intoxicated.

- Appellant's purported desire to protect occupants from Dunham was inconsistent with appellant's claim at trial that he was trying to protect Dunham from harm.

- Appellant's statements and actions after the incident indicated consciousness of guilt inconsistent with his self-defense claim: (1) he left the scene when he heard sirens without speaking to responding officers until they searched for him; (2) appellant exhibited a nonchalant attitude when Officer Gutierrez and Sergeant Payne went to his home as though appellant did not know the reason for their visit; (3) appellant specifically denied to these officers that he displayed a weapon; (4) when describing the incident to Sergeant Williams, appellant neglected to mention he displayed a weapon; (5) appellant refused to provide any further statements after these initial interviews, including any statement to his employer, the Metropolitan Police Department; and (6) appellant generally agreed in his conversation with Torres that they acted improperly during the incident. *See Miller v. State*, 177 S.W.3d 177, 184 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (considering evidence regarding consciousness of guilt when upholding

13

jury's rejection of self-defense claim); *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) (stating "'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt").

In sum, the evidence is legally sufficient to support the jury's implicit rejection of appellant's self-defense theory and his conviction for aggravated assault with a deadly weapon. We overrule appellant's first issue.

### III. JURY CHARGE

In his second issue, appellant contends the trial court erred by refusing to submit a mistake-of-fact instruction in the jury charge. "It is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." Tex. Penal Code Ann. § 8.02(a) (West 2011). When a defendant creates an issue of mistaken belief relative to the culpable mental element of the offense, he is entitled to a defensive instruction on mistake of fact. *Granger v. State*, 3 S.W.3d 36, 41 (Tex. Crim. App. 1999). The defendant is entitled to the instruction if the defense is raised by the evidence, "whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court thinks about the credibility of the evidence." *Id.* at 38. A defendant is not entitled to a mistake-of-fact instruction if he fails to inform the trial court of the specific fact on which he was mistaken. *Mays v. State*, 318 S.W.3d 368, 383 (Tex. Crim. App. 2010).

In his appellate brief, appellant suggests he pointed the rifle at Dunham because he mistakenly believed Dunham intended to strike him and that Dunham had already attacked appellant, fired the gunshots, or made the oral threat. After presentation of evidence, appellant made the following request for a mistake-of-fact instruction:

> Mistake of fact as to whether Anthony Dunham was either armed, was dangerous, or was preparing to attack, assault Mr. Rocha, any mistake of fact in that regard.
>
> It is clear from the evidence that at the very least Mr. Dunham had balled up his fist and cocked his arm back in a threat to punch Mr. Rocha.

14

Now, the witness Anthony Dunham led the jury to believe that he had no intention of hitting Mr. Rocha. And if that's true, Your Honor, then we submit that Mr. Rocha made a reasonable mistake of fact. He had a reasonable belief that he was about to be assaulted and that, in turn, should have given him the right to self-defense.

THE COURT: Well, and I think the self-defense is in there and I think from the facts that are raised, I think you can argue self-defense, but I don't think that's a mistake of fact charge, so I'm not going to include that.

Appellant clearly requested an instruction on his alleged mistaken belief that Dunham intended to strike appellant. However, appellant's request for an instruction that he mistakenly believed Dunham "was either armed, was dangerous, or was preparing to attack, assault [appellant]," did not specifically inform the trial court appellant mistakenly believed Dunham had *already* assaulted or threatened appellant or fired gunshots. Accordingly, appellant did not request an instruction regarding all purported mistakes of fact that he cites on appeal.

Nevertheless, any mistaken belief that Dunham intended to strike appellant, had attacked or threatened appellant, or had fired gunshots would not negate the culpable mental element of aggravated assault. Appellant does not dispute that he intentionally or knowingly pointed the rifle at Dunham to place him in fear of imminent bodily injury. Instead, appellant's alleged mistaken beliefs were merely facts relevant to whether he was justified in intentionally or knowingly pointing the rifle at Dunham to create such fear of imminent bodily injury; i.e., whether he acted in self-defense based on a reasonable belief such force or threat of force was immediately necessary to protect himself against Dunham's use or attempted use of unlawful force." *See* Tex. Penal Code Ann. § 9.31(a). In short, appellant relies on these alleged mistakes of fact not to negate elements of the offense but to prove another defense to prosecution–self-defense. Accordingly, the trial court did not err by refusing to submit a mistake-of-fact instruction. We overrule appellant's second issue.

15

## IV. COMMENTS ON POST-ARREST SILENCE

In his third issue, appellant argues the trial court violated appellant's rights under the United States and Texas constitutions by permitting the State to elicit testimony from appellant, and comment during closing argument, regarding his post-arrest silence. *See Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004) (recognizing Fifth Amendment to United States Constitution protects post-arrest silence after *Miranda* warnings are administered and Article I, section 10 of Texas Constitution protects post-arrest silence even before such warnings are administered).

### A. Appellant's Testimony

During cross-examination of appellant, the State elicited the following testimony:

Q.    . . . And you would agree you've been given an opportunity to give a statement on a number of occasions, haven't you?

A.    One time.
 . . .

Q.    All right, Mr. Rocha. You left off and you had indicated that Officer Gutierrez and Sergeant Payne had cut you off, correct?

A.    Correct.

Q.    All right. And that Sergeant Williams didn't allow you to tell your story, correct?

A.    Correct.

Q.    It's true, however, that the Metro Police Department invited and requested for you to make a statement, didn't they?
. . .

Q.    So, the Metro Police Department invited and requested you to make a statement regarding the incidents that occurred this night, didn't they?

A.    Yes.

Q.    Okay.  And you declined, correct?

A.  Yes.

Q.  So, this was the first time anybody's ever heard your version of the events that night, isn't it?

A.  Yes, Sir.

Appellant failed to preserve his appellate complaint for review because it does not comport with his objections at trial. *See* Tex. R. App. P. 33.1(a) (providing that, to preserve issue for appellate review, party must make timely objection or request to the trial court, sufficiently stating specific grounds for the requested ruling, unless apparent from the context, and obtain adverse ruling); *Wheatfall v. State*, 882 S.W .2d 829, 836 (Tex. Crim. App. 1994) (recognizing that complaint concerning admission of evidence regarding defendant's post-arrest silence must be preserved via proper objection, and, to preserve error, objection at trial must comport with appellate complaint).

When the State first asked whether appellant was afforded the opportunity to make a statement, he lodged a "relevance" objection, which the trial court overruled. Then, outside the jury's presence, appellant further objected that testimony appellant was requested, but declined, to make a statement would improperly constitute evidence he retained an attorney; appellant's counsel expressed concern that appellant might answer by explaining he declined to make a statement based on advice of counsel. *See* Tex. Code Crim. Proc. Ann. art. 38.38 (West 2005) (providing that evidence defendant contacted or retained attorney is not admissible on issue of whether he committed criminal offense and neither judge nor State's attorney may comment on fact defendant contacted or retained attorney). The trial court overruled the objection, remarking that the State was permitted to inquire whether appellant made a statement but precluded from asking whether he invoked his right to counsel, the reason he declined to make a statement, or "anything . . . about the lawyer." The court also allowed a break for counsel to instruct appellant to refrain from mentioning he invoked his right to counsel when

17

answering the State's questions. During the remainder of the above-quoted exchange, appellant reiterated his objection "under 38.38."

At trial, appellant failed to object that the subject testimony would constitute evidence of appellant's post-arrest silence. Appellant suggests his trial objection was equivalent to a complaint that the testimony constituted evidence of post-arrest silence. We disagree because these are clearly separate contentions; appellant relied on article 38.38 to support his trial objection and cites constitutional provisions to support his appellate complaint. Accordingly, appellant waived his post-arrest-silence contention.

Although appellant contends in his stated issue that the testimony constituted evidence of post-arrest silence, he asserts in the body of his argument, "The State's questioning inferred that appellant had sought advice from a lawyer . . ." To the extent that appellant, through this bare assertion, raises the same contention presented in the trial court, the trial court did not abuse its discretion by admitting the testimony. *See Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010) (stating appellate court reviews trial court's decision to admit evidence under abuse-of-discretion standard). Consistent with the trial court's instructions, the State did not ask whether appellant retained counsel, and appellant made no reference to retention of counsel when answering the State's questions. We reject appellant's suggestion that the State's inquiry regarding whether appellant made a statement implied his refusal to make a statement was based on advice of counsel.

**B.    Closing Argument**

Appellant also challenges the following portion of the State's closing argument:

> . . . And you know the beauty of why he gets to testify like he does is he chose not to give a statement to Metro, although he was requested. He chose not to testify in front of the grand jury. He chose not to ever tell his story until and after he heard every single witness the State called, so he could craft in his mind the best way that he could try to come up with a story to support self-defense and deceive you-all.

18

He wanted the first time it ever came out of his mouth to be in front of you-all. So 35 hours for five minutes? What a colossal waste. Yeah, if he would have been honest and given statements and told what happened instead of hiding

[APPELLANT'S COUNSEL]: Your Honor, I object --

[STATE]: -- upstairs –

[APPELLANT'S COUNSEL]: -- to Counsel –

[STATE]: Sorry.

THE COURT: What is your objection?

[APPELLANT'S COUNSEL]: Comments on post-arrest silence he said.

THE COURT: That's overruled.

[APPELLANT'S COUNSEL]: Your Honor, may I have a running objection on that?

THE COURT: Yes, sir.

Appellant failed to preserve error on his challenge to the first portion of the State's argument because his objection was untimely. An objection is timely if "made as soon as the ground for complaint is apparent or should be apparent." *Lovill v. State*, 319 S.W.3d 687, 692 (Tex. Crim. App. 2009). Without drawing any objection, the State first cited appellant's refusal to make a statement to the Metropolitan Police Department, refusal to testify before a grand jury, and general failure to provide any statement until testifying at trial. In fact, appellant had not yet objected when the State then switched to repeating an assertion previously made by appellant during his closing argument: the State consumed thirty-five hours of trial testimony dissecting appellant's actions during a five-minute incident. When the State then responded to appellant's closing argument by again citing his failure to make any statements, appellant objected that the State's argument constituted a comment on appellant's post-arrest silence and obtained a running

19

objection. Appellant's complaint that the State was purportedly commenting on appellant's post-arrest silence was certainly apparent when the State first cited, without objection, all the instances in which appellant failed to provide his version of the incident.

Appellant did preserve error with respect to this last sentence of the above-quoted argument. However, even if the trial court erred by overruling the objection, any error was harmless because the same argument had already been advanced without objection. *See Davis v. State*, 329 S.W.3d 798, 823 (Tex. Crim. App. 2010). Accordingly, we overrule appellant's third issue.

## V. REFERENCES TO APPELLANT DURING CLOSING ARGUMENT

In his fourth issue, appellant contends he was denied a fair trial because the State referred to him by several derogatory terms during closing argument.

Permissible general areas of jury argument are (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) answers to arguments of opposing counsel, and (4) pleas for law enforcement. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). We review a trial court's ruling on an objection to jury argument under the abuse-of-discretion standard. *See Davis*, 329 S.W.3d at 825. When a trial court has sustained a defendant's objection to improper jury argument and instructed the jury to disregard the argument, we review whether the court's refusal to grant a mistrial was an abuse of discretion. *Archie v. State*, 340 S.W.3d 734, 738 (Tex. Crim. App. 2011). In this evaluation, we consider (1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) measures adopted to cure the misconduct (efficacy of any cautionary instruction by the trial court), and (3) certainty of conviction absent the misconduct (strength of evidence supporting the conviction). *Id.*

Appellant complains about several portions of the State's closing argument. First, when responding at another point to appellant's suggestion that prosecution for a brief incident was a waste of time, the State argued,

There was an allegation made that we spent 35 hours for five minutes of time. Untrue. Untrue. Who could have a changed all of that? Who, in this courtroom, could have changed all that if we had any proof? Who? Michael Rocha. Michael Rocha. That rat, remember, went back upstairs after this and hid out. His testimony is he was calming his boys down. Remember the police were down there 30 to 45 minutes.

The trial court sustained appellant's objection to the State's use of the term "rat," instructed the jury to disregard the comment, and overruled appellant's request for a mistrial.

Despite sustaining appellant's objection, the trial court would have acted within its discretion by determining the State's reference to appellant as a "rat" who evaded the police was, albeit colorful, a reasonable deduction from the evidence indicating he returned to his apartment without speaking to investigating officers until they searched for him. *See Davis*, 329 S.W.3d at 823 (holding State's reference in closing argument to defendant as "con man" was reasonable deduction from contrast between his testimony claiming remorse for offense and other evidence indicating he was deceitful); *Temple v. State*, 342 S.W.3d 572, 606 (Tex. App.—Houston [14th Dist] 2010, pet. granted) (holding trial court did not abuse its discretion by determining prosecutor's reference in closing argument to defendant as "the stud" of his high school and college was, despite colloquialism, reasonable deduction from evidence showing he was football standout who received much publicity). Accordingly, under the above-cited factors, we conclude the trial court did not abuse its discretion by refusing to order a mistrial.

Next, while arguing that appellant, Torres, and Hatamleh were a "disgrace" to law enforcement and behaved arrogantly during the incident because they felt disrespected as police officers, the State asserted,

These are the officers that we have a right to be proud of. Officers doing their job. Not these thugs that got uniforms and guns.
. . .

These guys are clowns. They don't have any business in law enforcement.
. . .

> We like to believe our police officers are good, honest, hard-working people. Unfortunately, we've got a few bad apples: Torres, Hatamleh ain't so great, and [appellant].

The trial court overruled appellant's objections to the State's use of the terms "thugs." "clowns," and "bad apples."

We conclude the trial court did not abuse its discretion by determining that the State's use of these terms, although again colorful, were reasonable deductions from the evidence indicating appellant reacted to his involvement in the brawl by angrily and unnecessarily threatening Dunham with the assault rifle appellant was certified to carry as a police officer. Accordingly, we overrule appellant's fourth issue.

We affirm the trial court's judgment.


/s/    Charles W. Seymore
Justice


Panel consists of Justices Frost, Seymore, and Jamison.
Do Not Publish — Tex. R. App. P. 47.2(b).